Samuel MIHARA, Plaintiff-Appellee,

v.

DEAN WITTER & CO., INC. and George Gracis, Defendants-Appellants.

Nos. 78–2022, 78–2729.

United States Court of Appeals, Ninth Circuit.

May 23, 1980.

Eugene W. Bell, Los Angeles, Cal., argued for defendants-appellants; John F. Busetti, Jones, Bell & Simpson, Los Angeles, Cal., on brief.

Allen L. Neelley, Gregory A. Wedner, Smaltz & Neelley, Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS and TANG, Circuit Judges, and CAMPBELL,* Senior District Judge.

WILLIAM J. CAMPBELL, Senior District Judge:

On April 26, 1974, Samuel Mihara filed this action in United States District Court for the Central District of California. He alleged both federal statutory and Califor-

---

* The Honorable William J. Campbell, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

nia common law fiduciary duty claims arising from the handling of Mihara's securities accounts by defendants. Specifically, plaintiff alleges that the defendants, Dean Witter & Company and its account executive, George Gracis, engaged in excessive trading or "churning" in plaintiff's securities account, and purchased "unsuitable" securities which did not conform to Mihara's stated investment objectives. Plaintiff sought relief under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) and Rule 10b–5 promulgated thereunder, as well as for breach of fiduciary duties. Plaintiff sought both compensatory and punitive damages, and demanded a jury trial.

On February 2, 1978, after a jury trial, a verdict was entered for Mihara and against the defendants on both the Rule 10b–5 claim and the State breach of fiduciary duty claim. Compensatory damages in the amount of $24,600 were awarded to Mihara, a punitive damages award of $66,666 was assessed against Dean Witter & Company, and a $2,000 punitive damage award was assessed against defendant Gracis. Defendants subsequently filed motions for new trial and judgment notwithstanding the verdict, having moved for a directed verdict at trial, which motions were denied. Dean Witter & Company and Gracis (hereinafter appellants) appeal from the denial of those motions, and the plaintiff Mihara appeals from an order disallowing recovery of $1,800 in costs.

On January 6, 1971, plaintiff Mihara opened a joint securities account with the Santa Monica office of Dean Witter. At that time Mihara was employed by the McDonnell-Douglas Corporation as a supervisory engineer. He was 38 years old and possessed a Bachelor of Science and Master's Degree in Engineering. He and his wife were the parents of two daughters. Mihara's assets at the time consisted of approximately $30,000 in savings, an employee's savings account at McDonnell-Douglas of approximately $16,000, an equity in his home for approximately fifteen to seventeen thousand dollars. He also held shares of McDonnell-Douglas stock obtained through an employee payroll deduction plan.

Prior to opening his account with Dean Witter, Mihara had invested in securities for approximately ten years. He had dealt with several other firms during that period, but apparently felt that his account had not received adequate attention, and was looking for a new investment firm. Mihara opened his account with Dean Witter in January of 1971 by telephoning Stuart Cypherd, the office manager for Dean Witter's Santa Monica office, and asking to be assigned an account executive. Cypherd, in turn, instructed defendant Gracis to phone Mihara to set up an appointment.

The evidence as to the content of the initial meeting between Mihara and Gracis is conflicting. Mihara testified that as an engineer he lacked a finance and economics background and was looking for someone with expertise on which he could rely. He also stated that he was concerned about possible cutbacks at McDonnell-Douglas, noting that layoffs were common in that industry. He indicated that he was concerned about the education of his two daughters, and their financial security.

Gracis' testimony with regard to their initial meeting, and specifically relating to Mihara's investment objectives, differs substantially. Gracis testified that Mihara was not concerned about a possible layoff, that he was primarily interested in growth, and that he was knowledgeable about margin accounts and broker call rates.

Mihara invested $30,000 with Dean Witter. This money was to be invested according to Gracis' recommendations but subject to Mihara's approval.

The history of Mihara's investment account with Dean Witter & Company reflects speculative investments, numerous purchases and sales, and substantial reliance on the recommendations of Gracis. The initial recommendations of Gracis were that Mihara purchase shares of companies engaged in the double-knit fabric industry. These stocks included Venice Industries, Devon Apparel, Edmos, Fab Industries, D.

H. J. Industries, Leslie Fay, Graniteville, Duplan, and United Piece and Dye. From 1971 to 1973, Mihara's account lost considerable sums of money. Since many of the purchases were on margin, Mihara would often have to come up with additional funds as the equity in his account declined. The final trading losses in the account totaled $46,464. This loss occurred during the period of January 1971 to May 1973.

Mihara first began to complain of the handling of his account when it showed a loss in April 1971. At that time he complained to Gracis because his account was losing money, then about $3,000. Throughout 1971, as Mihara's account lost money, he continued to complain to Gracis. In October of 1971, Mihara went to Mr. Cypherd, the office manager for the Santa Monica office of Dean Witter. Mihara complained to Cypherd about the handling of the account by Gracis. He did not, however, close out the account. As the value of Mihara's securities account continued to dwindle, he visited Cypherd on several occasions to complain further about Gracis. While Cypherd told Mihara he was "on top" of the account, the performance and handling of the account did not improve.

At about the same time that Mihara first contacted him, Cypherd was also made aware of substantial trading in the account by means of a Dean Witter Monthly Account Activity Analysis. This analysis was initiated by the Dean Witter computer whenever an account showed 15 or more trades in one month or commissions of $1,000 or more. Because Mihara's account reflected 16 trades for the month of April 1971, Cypherd was alerted to the problem at that time. In May of 1971, the Dean Witter computer generated another monthly account activity analysis as the result of 21 trades during that month in Mihara's account. Mihara's account in March of 1971 reflected 33 transactions, however, the computer did not generate an account analysis.

In November 1973, Mihara went to the San Francisco office of Dean Witter and complained to Paul Dubow, the National Compliance Director for Dean Witter, Inc.

At that point Mihara's account had suffered considerable losses. Apparently not satisfied with the results of that meeting, Mihara filed this suit in April 1974.

The case experienced several delays in getting to trial. The trial was initially set for September 27, 1977. On May 2, 1977, plaintiff's counsel advised defense counsel that he intended to obtain another expert witness to testify at trial. On August 17, 1977, defendants moved for a continuance of the upcoming trial, or in the alternative, to exclude plaintiff's new expert, who at that time had not been designated. Immediately thereafter, plaintiff's counsel informed defendants that the additional expert witness was Mr. Robert McCuen, made him available for deposition, and the parties stipulated that the trial should be continued until November 15, 1977. Defense counsel was apparently unable to depose McCuen, and obtained a continuance of the trial until January 17, 1978.

On November 18, 1977, plaintiff disclosed the identity of a second expert witness, a Mr. Dennis White. Thereafter, defendants moved again for a continuance of the trial, which motion was set for hearing on January 9, 1978. On the day of the hearing, Mr. White was made available for deposition. At that time Mr. White, an attorney, requested that he be paid for his deposition time. At the hearing on January 9, 1978, defendants argued that they were being prejudiced due to the insufficiency of time to rebut Mr. White's testimony and sought a further continuance. The Court denied the motion for continuance, Mr. White's deposition was not taken by defendants, and the trial commenced on January 17, 1978.

At the hearing just prior to trial, defense counsel objected to a trial by jury. Plaintiff had made a demand for jury trial in his complaint. The pretrial order, however, made no mention of a jury trial. The Court held that the request for a jury trial had not been withdrawn.

At trial plaintiff gave his recollection of the initial meeting with Gracis. He testified that Gracis recommended securities

which did not appear to conform to those objectives. He also related the dismal record of the account, and how attempts to remedy the situation through meetings with Gracis' superiors proved fruitless. Plaintiff also introduced the Dean Witter Account Executive Manual (Plaintiff's Exhibit 1) which stated that Dean Witter account executives had a "sacred trust to protect" their customers, that Dean Witter customers have confidence in the firm, and "under no circumstances should we violate this confidence."

Mr. Paul Dubow, the National Compliance Director for Dean Witter from November 1971 through July 1974, testified as to his company's compliance duties, internal monitoring systems, and the responsibilities of supervisory personnel in monitoring clients' accounts. Mr. Dubow was also questioned by plaintiff's counsel regarding various New York Stock exchange (NYSE) and National Association of Security Dealers (NASD) rules and regulations. Both Mr. Dubow and Mr. Cypherd were specifically questioned regarding NYSE Rule 405 which requires that all account executives learn all essential facts about their clients (the "Know Your Customer Rule") and Article 3, Section 1 of the NASD Rule of Fair Practice which requires supervisory personnel to make sure that account executives are dealing fairly and within the objectives of their clients and to "know the client".

Plaintiff's expert, Mr. White, a former attorney with the Securities & Exchange Commission, testified at trial that the pattern of trading in the Mihara account reflected a pattern of churning. Plaintiff's Exhibit 20, Chart G, introduced at trial, indicated the following holding periods for Mihara's securities. In 1971, 50% of the securities were held for 15 days or less, 61% for 30 days or less, and approximately 76% were held for 60 days or less. Through June of 1973, 81.6% of the securities in the Mihara account were held for a period of 180 days or less. White also relied on the "turnover rate" in Mihara's account in reaching his conclusion. The turnover rate for a given period is arrived at by dividing the total dollar amount of stock purchases for a given period by the average monthly capital investment in the account. Plaintiff's Exhibit No. 20, Chart C, indicates that between January 1971 and July 1973, Mihara's average monthly investment of $36,653 was turned over approximately 14 times. On an annualized basis, Mihara's average capital monthly investment in 1971 of approximately $40,000 was turned over 9.3 times. His average capital investment in 1972 was $39,800 and that was turned over approximately 3.36 times. His average monthly capital investment for the first half of 1973 was $23,588 and that was turned over approximately .288 times. White testified that a substantial turnover in the early stages of the account followed by a significant decline in the turnover rate was typical of a churned account.

White also testified that the holding periods for securities in Mihara's account reflected a pattern of churning. He noted that churned accounts usually reflect significant turnover in the early stages, that is, a very short holding period for the securities purchased, followed by longer holding periods in the later stages of the account. Thus, the typical churned account is churned in the early stages of the account generating large commissions at the outset, followed by less trading and longer holding periods in the latter stages of the account, after significant commissions have been generated. Mihara's account reflects precisely that pattern. The cumulative total of commissions earned by Gracis was $12,672, the majority of which came in the early stages of the account.

In addition to the testimony of Mr. White that, in his expert opinion, Mihara's account had been "churned," plaintiff's expert witness McCuen also testified that in his opinion the securities purchased from Mihara's account were not suitable for Mihara's stated investment objectives. Mr. McCuen based his analysis in part on rankings found in reports in the "Value Line" investment service newsletter which rates those stocks poorly. Mr. McCuen noted that the securities in question were rated as high risk securities with below average financial strength.

At the close of plaintiff's presentation of evidence on the issue of liability, defense counsel moved for a directed verdict for failure to establish a prima facie case on both claims and on the grounds the plaintiff's testimony revealed existence of defenses as a matter of law. The Court denied the motion.

The defendant Gracis testified that Mihara was more interested in riskier growth potential investments. He stated he recommended such stocks, but also noted the drawbacks of such investments. Gracis testified that he also warned of the dangers of utilizing a margin account. Gracis also confirmed Mihara's testimony concerning complaints about losses in Mihara's account. Gracis was not permitted to testify about conversations with his office manager, Mr. Cypherd, regarding the Mihara account, on grounds of hearsay and irrelevance.

A stock broker at an investment firm Mihara had dealt with in the past testified that Mihara had been interested in growth stocks, had discussed margin accounts, though never initiated one, and had a "good knowledge" of the stock market.

Mr. William Bedford, an investment counselor, testified as defendant's expert witness regarding the suitability of the Mihara account. Bedford testified that given an aggressive growth investment objective, the securities in plaintiff's account were not unsuitable, nor the transactions excessive.

Finally, Mr. Cypherd testified regarding his supervisory function at Dean Witter, noting that he received various daily documents and reports relating to customer accounts and that he would regularly make inquiries of brokers regarding their customers' accounts. He testified that in October of 1971 he advised plaintiff that he was dealing in volatile securities, that he was paying considerable commissions and that perhaps his use of a margin account was excessive. Cypherd also verified that he had spoken with Gracis about the account on several occasions and that he would mention conversations between himself and Mihara to Gracis.

At the completion of testimony, the parties moved for the admission into evidence of the various exhibits. Defendants objected to plaintiff's exhibits 7, 8 and 9 (plaintiff's annual portfolio statements) and plaintiff's exhibits 11, 12, 13 and 14 (Gracis' income tax returns) on relevancy grounds and because they were prejudicial; plaintiff's exhibit 20 (the chart showing the trading and turnover rate of plaintiff's account) on the ground that the Federal Rules of Civil Procedure relating to discovery had been violated; and to exhibit 22 (McCuen's Value Line analysis) on the ground of irrelevance. These objections were overruled and the exhibits were admitted into evidence.

Defendants then repeated their motion for a directed verdict, which was denied. The jury was then charged, returned for its deliberations, and returned a verdict for the plaintiff.

Appellants present numerous issues on appeal. The main points raised on appeal can be summarized as follows: Whether plaintiff established a prima facie case of a violation of Rule 10b–5, and of breach of fiduciary duty; whether defendant's affirmative defenses were established as a matter of law; whether certain actions of plaintiff's counsel denied defendants a fair trial; whether the Court erred as a matter of law with respect to pretrial orders, evidentiary rulings, or jury instructions; whether the damage awards are inconsistent; and whether the denial of the motion for a new trial was an abuse of discretion.

We believe the District Judge should be commended for his handling of what appears from the record to have been a difficult and demanding trial. We affirm the judgment below in all respects.

When a securities broker engages in excessive trading in disregard of his customer's investment objectives for the purpose of generating commission business, the customer may hold the broker liable for churning in violation of Rule 10b–5. *Hecht v. Harris Upham & Company,* 430 F.2d 1202

(9th Cir. 1970).[1] In order to establish a claim of churning, a plaintiff must show (1) that the trading in his account was excessive in light of his investment objectives; (2) that the broker in question exercised control over the trading in the account; and (3) that the broker acted with the intent to defraud or with the wilful and reckless disregard for the interests of his client. *Rolf v. Blyth, Eastman, Dillon & Company, Inc.*, 424 F.Supp. 1021, 1039–1040 (S.D.N.Y., 1977) aff'd at 570 F.2d 38 (1978), cert. denied 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

■ Whether trading is excessive is a question which must be examined in light of the investment objectives of the customer. While there is no clear line of demarcation, courts and commentators have suggested that an annual turnover rate of six reflects excessive trading. *See Rolf v. Blyth, Eastman, Dillon & Company*, 424 F.Supp., at 1039. *See also* Churning by Securities Dealers, 80 Harv.L.Rev. 869 (1967). In *Hecht v. Harris Upham & Company*, 283 F.Supp. 417 (N.D.Cal., 1968), aff'd at 430 F.2d 1202, 1210 (9th Cir., 1970), this Court affirmed a finding of churning where an account had been turned over 8 to 11.5 times during a six-year ten-month period. In that case, 45% of the securities were held for less than six months, 67% were held for less than nine months, and 82% were held for less than a year. Under this Court's holding in *Hecht*, the evidence in the present case clearly supports a finding of excessive trading.

■ With regard to the second prerequisite, we believe that Gracis exercised sufficient control over Mihara's account in the present case to support a finding of churning. The account need not be a discretionary account whereby the broker executes each trade without the consent of the client. As the *Hecht* case indicates, the requisite degree of control is met when the client routinely follows the recommendations of the broker. The present case, as in *Hecht*, reflects a pattern of *de facto* control by the broker.

■ The third requisite element of a 10b–5 violation—scienter—has also been established. The manner in which Mihara's account was handled reflects, at best, a reckless disregard for the client's investment concerns, and, at worst, an outright scheme to defraud plaintiff. Perhaps in recognition of this, appellants have constructed a curious argument as to the scienter element. They suggest that plaintiff must establish an intent to defraud as to each trade executed by the broker. This assertion is entirely without merit. The churning of a client's account is, in itself, a scheme or artifice to defraud within the meaning of Rule 10b–5. With regard to the definition of scienter, this circuit has held that reckless conduct constitutes scienter within the meaning of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 99 S.Ct. 1375, 47 L.Ed.2d 668 (1976). *See Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir., 1978). The evidence in the present case reflects, at the very minimum, a reckless disregard for the client's stated interests.

■ Appellants' second contention is that plaintiff failed to establish a *prima facie* case of breach of fiduciary duty under California law. The central theme of this argument is that no fiduciary relationship was ever established between plaintiff and defendants, Dean Witter and Gracis, because defendants never accepted a fiduciary duty

---

1. The Securities & Exchange Commission's Rule 10b–5, promulgated under the general anti-fraud provisions of the Securities Exchange Act of 1934, provides:

 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or or any facility of any national securities exchange,

 (1) to employ any device, scheme or artifice to defraud;

 (2) to make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

 (3) to engage in any act, practice, or course of business which would operate as a fraud or deceit upon any person . . . in connection with the purchase or sale of any security.

or position of trust with respect to plaintiff's account. Appellants' argument attempts to view the establishment of a fiduciary relationship in contractual terms of offer and acceptance. They contend that they never "accepted" a fiduciary responsibility toward plaintiff. This argument is without merit. The Dean Witter Account Executive Manual introduced at trial instructs securities brokers that "our client has a right to believe and trust you" and that Dean Witter has "a sacred trust to protect our customers." Even without these statements as to how Dean Witter viewed its relationship with its clients, the account executive has a duty not to place his interests over those of his client by generating commissions through excessive, unwarranted trading.

■ Appellants also argue that the defenses of estoppel, waiver, ratification, laches, and failure to mitigate damages were established as a matter of law. Appellants rely principally on *Hecht v. Harris Upham & Company, supra.* In that case the District Court found that plaintiffs were barred from complaining about the specific purchases of stock by estoppel, laches, and waiver. As in the present case, the plaintiff in *Hecht* received confirmation slips stating exactly what had been purchased and indicating the amount paid. The Court in *Hecht* went on to find, however, that while the plaintiff was barred from complaining about specific purchases of stock, she was not estopped from maintaining a claim for excessive trading. The Court concluded that while confirmation slips were sufficient to inform plaintiff of the specific transactions made, they were "not sufficient to put her on notice that the trading of her account was excessive." *Hecht v. Harris Upham*, 430 F.2d, at 1210. Thus, the defenses raised by appellants apply only to plaintiff's claims regarding the suitability of the stocks purchased, and not to the claim of churning.

■ With respect to appellants' contention that the affirmative defenses were established as to the suitability claim, Mihara responds by pointing out that the Court

properly instructed the jury with respect to the affirmative defenses raised by appellants, and that the jury simply rejected those defenses. He contends that the findings that plaintiff was not estopped, did not waive any claims against appellants, and attempted to mitigate his damages are not clearly erroneous and should not be overturned by this Court. Since plaintiff, on numerous occasions, contacted defendants in an effort to reverse the trend in his account, and complained about Gracis' handling of his account, there is ample evidence to support the jury's finding as to these affirmative defenses. We affirm that finding.

■ While the Court instructed the jury with regard to estoppel, waiver, and the mitigation of damages, he did not instruct the jury with regard to ratification and laches. Laches are applicable to private actions under Section 10(b) of the Securities Exchange Act. *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 214 (9th Cir., 1962). In order to invoke the defense of laches, there must be (1) a lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense. *Hecht v. Harris, supra*, 430 F.2d 1202, 1208. In the present case, the trial court did not instruct with regard to laches since appellants had failed to offer any evidence of prejudice resulting from plaintiff's delay in bringing the action. Thus, while laches is a valid defense to a 10b–5 claim, the trial court found the defendants had failed to present any evidence of prejudice resulting from plaintiff's delay, and thus failed to establish laches as a matter of law. We believe this ruling by the District Court is not clearly erroneous, and should be affirmed.

■ Appellants also argue that so-called "irregularities" in the proceedings below acted to deny defendants a fair trial. These alleged irregularities include: the Court's January 9th denial of the continuance of the trial; inadequate time to review Exhibit 22, the rating of the securities in question by plaintiff's expert witness McCuen; alleged "mischaracterizations" by

plaintiff's counsel regarding the Dean Witter Account Executive Manual; the "condemning by innuendo Gracis' record" by plaintiff's counsel; and various characterizations of the evidence by plaintiff's counsel at trial. In response to these arguments, appellee Mihara points out that expert witnesses were made available for deposition as soon as their identity was learned by plaintiff's counsel, yet defense counsel chose not to depose said witnesses. Back-up materials, such as Exhibit 22, were made available to defense counsel. With respect to any inferences or innuendo, appellee argues that counsel are permitted to argue all permissible inferences which may be drawn from the evidence. Finally, appellee's respond to the argument concerning irregularities in the trial by noting that the law simply entitles defendant to a fair trial, not a perfect one. *Mills v. Mealey*, 274 F.Supp. 4, 7 (W.D.Va., 1967).

We find the contention that appellants were denied a fair trial to be totally without merit. The trial judge afforded both parties ample opportunity to present evidence in a clear, informed and unbiased manner. We are convinced that the parties received a fair trial from our review of the record.

Appellants' next issue on appeal is a general catch-all category entitled "Errors of Law." These alleged errors of law relate to pretrial orders, the admission of testimony, and jury instructions. Appellants list no less than 19 separate alleged errors of law.

Appellants' first alleged error relates to the Court's denial of defense motions for continuance. Specifically, appellants claim that the Court was required to grant a continuance on January 9th of a trial set for January 17th since the ensuing eight days would be insufficient to prepare a rebuttal to plaintiff's expert witness, Mr. White. White was available for deposition on January 9th and appellants simply declined to take that deposition. This argument is entirely without merit and warrants no further discussion. Moreover, the decision as to whether to grant a continuance is discretionary, and we find no abuse of discretion.

The second pretrial order, which appellants claim constitutes an error of law, is the Court's Order setting the case for jury trial. They contend that plaintiff waived the right to a jury trial. Yet, appellants are unable to point to an oral stipulation in open court required by Rule 39(a) of the Federal Rules of Civil Procedure before a demand for jury trial can be waived. In response to appellants' arguments against a jury trial, the Court below made a finding that the right to jury had not, in fact, been waived. The record supports that finding.

The third pretrial order under attack is the Court's denial of appellants' motion to join Mrs. Mihara as an indispensable party. The trial court noted that Mr. Mihara had sole custody and control of the joint account. Appellants contend that Section 5125(a) of the California Civil Code confers an interest in the account to plaintiff's wife even though she exercised no control over that account. Appellee responds to this argument by noting that Section 5125 did not become effective until January 1, 1975, after the events giving rise to this litigation. We are convinced that Mrs. Mihara held no interest in this account which was not fully and lawfully represented by her husband. We therefore conclude that the entire controversy has been settled by this lawsuit, and there is no risk of double liability against the defendants. *See* Rule 19(a) Fed. Rules Civ. Pro. We reject appellants' assertion of error resulting from the failure to join an indispensable party.

The alleged errors of law with regard to the testimony admitted at trial are: (1) permitting testimony with regard to Exhibits 20 and 22, of which appellants did not have advance notice prior to trial; (2) permitting testimony regarding the rules and regulations of the New York Stock Exchange; (3) preventing defendant Gracis from testifying regarding his conversations with office manager Cypherd; and (4) permitting testimony with regard to the "Account Executive's Manual" for Dean Witter & Company. Appellants' first point

merits little discussion. Appellants were given ample time to review plaintiff's exhibits prior to their being offered into evidence. Appellants' second point, that the Court should not have permitted testimony regarding the rules and regulations of the New York Stock Exchange, is without merit. New York Stock Exchange Rule 405 requiring that each securities broker "know [his] customer" has been recognized as a standard to which all brokers using the Exchange must be held, the violation of which is tantamount to fraud. *Rolf v. Blyth, Eastman, Dillon, supra,* 424 F.Supp., at 1041. The Court in *Rolf* went so far as to permit a private cause of action for violation of NYSE Rule 405. *Id.* Appellants contend that the admission of testimony regarding New York Stock Exchange and NASD rules served to "dignify those rules and regulations to some sort of standard." The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held.

With regard to the exclusion of Gracis' testimony as to what he told his employer about plaintiff, such statements would not appear to be hearsay if limited to the witness's own comments to his employer, and not used as a vehicle for introducing statements of others. However, in light of defense counsel's agreement with the Court's disposition of the hearsay objection, on the record, we believe defense counsel has waived any right to raise this point on appeal.

■ Appellants also claim the Court erred in receiving into evidence the Account Executives Handbook for Dean Witter, Dean Witter's annual reports, and Gracis' personal tax returns. The handbook was admitted for the purpose of establishing a fiduciary relationship between plaintiff and defendants. It was clearly relevant and proper for that purpose. The annual reports (though they reflect the income of the parent corporation, Dean Witter Organization, rather than Dean Witter & Company) and Gracis' tax returns, were clearly relevant for the determination of punitive dam-

ages. Punitive damages are recoverable for a breach of fiduciary duty pursuant to Section 3294, California Civil Code.

Appellants assert separate errors in the instructions to the jury. Some of these points are based on incorrect arguments of law which we have already addressed. For example, the law does not require that each transaction in a churning scheme be shown to be fraudulent. To instruct the jury in that manner—as appellants desired—would have been incorrect. Also, the failure to instruct on ratification and laches is based on the Court's determination that defendants had failed to come forward with evidence to support those defenses, a decision which we affirm. Appellants' numerous objections to the instructions given are either without merit, or are based on an inaccurate reading of the record. We shall briefly address those contentions.

Appellants claim the Court erred in instructing the jury to consider the failure to explain or deny inferences, weaker evidence and wilful suppression because there was no evidence to justify such instructions. This argument is apparently a byproduct of appellants' claim that plaintiff failed to introduce any evidence to support his claim. Since there were numerous exhibits and extensive testimony in this trial, this instruction was clearly proper.

■ Appellants claim error in the Court's instruction that a broker's activities are of necessity connected with the purchase and sale of securities. Appellants contend that "the effect of this instruction was to take away from the jury the question of whether there was a fraud as to each purchase and each sale in the account." While it is difficult to perceive how this instruction had that effect, such an effect is entirely permissible in a claim of churning. Appellant also attacks the use of the standard jury instructions on churning. *See* Devitt & Blackmar, *Federal Jury Practice and Instructions 3rd Ed.* (1977) § 98.13. That instruction provides:

"Churning occurs when a broker, exercising control over the volume and frequency of trades, abuses his customer's confi-

dence for personal gain by initiating transactions that are excessive in view of the character of the account and the customer's objectives as expressed to the broker. Churning, if established by a preponderance of the evidence, is a scheme or artifice to defraud and a fraudulent and deceptive device within the meaning of Rule 10b–5."

We believe this instruction correctly states the law, and was properly given in this case.

Appellants assert that it was error to instruct the jury that a customer invariably relies on his broker. This misstates the instruction given by the Court. The Court stated that the jury "may or may not infer from the evidence that the customer invariably relied on the broker's recommendations . . . ." Since a certain degree of control of the client's account by the broker is essential to a claim of churning, it is permissible for the Court to instruct the jury that that control may be the result of the customer's invariably relying on the broker's recommendations.

■ Appellants' contention that the Court erred in failing to instruct the jury that a breach of fiduciary duty under California law requires an intent to deceive, and that the would-be fiduciary must accept the responsibility to act as such before he can be charged as a fiduciary, is also without merit.

The Court properly instructed the jury as to the requisite elements of a breach of fiduciary duty; and that in addition to such a breach, plaintiff must also show actual fraud in order to recover punitive damages. The notion that the fiduciary must make some form of acceptance of his responsibility is simply not the law. It is sufficient that defendants "knew or should have known that such trust and confidence had been reposed in them." That is the instruction given by the Court.

■ The Court also instructed the jury that a broker has a duty to investigate stocks he recommends to his client. Clearly, a broker has the responsibility to know what he is recommending to his client.

Without such investigation, he cannot be assured that he is recommending a security suitable to his client's investment objectives.

Appellants' assertion that the Court improperly instructed the jury to consider whether defendants rendered damages unascertainable is misleading. The Court simply instructed the jury that a defendant whose wrongful conduct renders a damages calculation difficult cannot escape liability because damages may not be ascertained with precision. We find no error in that instruction.

The contention that the Court incorrectly instructed the jury regarding the applicability of *respondeat superior* to a 10b–5 claim is also unsupported by the record. The Court gave the *respondeat superior* instruction in connection with the fiduciary duty claim, and limited it to that claim.

■ Finally, appellants argue that the issue of punitive damages should not have gone to the jury. Appellants' principal argument is that under California law a finding of constructive fraud or breach of fiduciary duty is insufficient to support a punitive damages award under § 3294. (Cal. Civil Code) They contend that actual malice, fraud, or oppression must be found. Appellants rely on the case of *Security-First National Bank of Los Angeles v. Lutz*, 297 F.2d 159 (9th Cir., 1961). Section 3294 permits "damages for the sake of example and by way of punishing the defendant." In the *Lutz* case the Court found that while an accountant was under a duty to disclose all relevant facts in a sale of his client's securities, the negligent failure to disclose material facts could not support a punitive damages award against him. Appellee points out that the Court specifically instructed the jury that punitive damages must be bottomed on more than a breach of fiduciary duty. The Court instructed the jury that malice or actual fraud must be found before they can award punitive damages. The Court also instructed that "malice may be inferred from acts or conduct done with knowledge that such acts or conduct were substantially certain to vex, ha-

rass, annoy or injure plaintiff." The Court's instruction was proper as to the punitive damages issue.

Appellants also argue that there was no evidence of the requisite state of mind to justify punitive damages. That argument must be rejected. There was sufficient evidence in the record to permit the question to go to a jury.

■ Appellants take issue with the jury's damage awards. The jury awarded Mihara $24,600 in actual damages and $66,-666 punitive damages. Appellants claim these awards are excessive and contrary to law. The jury's actual damages award is approximately half the entire loss claimed by plaintiff as a result of commissions, interest, and trading losses. Total commissions and interest were approximately $18,-000, and appellants argue that actual damages should be limited to that amount. While damages for churning are limited to commissions and interest, plaintiff's claim as to the suitability of the securities purchased would also encompass trading losses. Thus, the jury award appears to compensate plaintiff for all commissions and interest paid and for a portion of his trading losses. We find the award reasonable in light of the evidence and not excessive.

■ Appellants' argument with respect to punitive damages is that the award is excessive in light of actual damages, and reflects a quotient verdict. This first argument is without merit. In *Wetherbee v. United Insurance Company of America*, 95 Cal.Rptr. 678, 18 Cal.App.3d 266, 271 (1971), the court affirmed a punitive damage award of $200,000, supported by an actual damage award of $1,050. The appellate court noted that the $200,000 award represented less than one week of defendant's after tax income and that such an award served as an appropriate punishment notwithstanding the degree to which it exceeded the actual damage award. That reasoning is equally applicable in the present case. The contention that the award reflects a quotient verdict can only be supported by speculation.

The final issue asserted by appellants is that the Court's denial of the defense motion for a new trial was an abuse of discretion. The trial court's decision as to whether to grant a new trial should only be reversed in the event of a clear abuse of discretion. We find no abuse of discretion by the District Judge. To the contrary, we believe the evidence supports the verdict and the District Judge correctly denied the motion.

Appellee has also filed a cross appeal seeking reversal of the District Court's determination as to the taxing of costs incurred in the preparation of plaintiff's exhibit 20. The District Court, after a hearing on the question, determined that these costs were not taxable. Such a determination is discretionary, and we find no abuse of discretion.

The judgment of the District Court is AFFIRMED.