681 F.2d 673
 Fed. Sec. L. Rep. P 98,767
Merrill M. FOLLANSBEE, Plaintiff-Appellee,
v.
DAVIS, SKAGGS & CO., INC., a Delaware Corporation, and
Chester T. Bjerke, Jr., Defendants-Appellants.
Merrill M. FOLLANSBEE, Plaintiff-Appellant,
v.
DAVIS, SKAGGS & CO., INC., a Delaware Corporation, and
Chester T. Bjerke, Jr., Defendants-Appellees.
 Nos. 81-4187, 81-4202.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 12, 1982.
Decided July 16, 1982.
 
 Eric G. Wallis, Jay R. Martin, Crosby, Heafey, Roach & May, Oakland, Cal., for Davis, Skaggs & Co.
 Thomas C. Perkins, Sacramento, Cal., for Follansbee.
 Appeal from the United States District Court for the District of Northern California.
 Before HAYNSWORTH,* Senior Circuit Judge, and CHOY and SCHROEDER, Circuit Judges.
 HAYNSWORTH, Senior Circuit Judge:
 
 
 1
 In September, 1975 Follansbee filed this action against Davis, Skaggs & Co. and Chester Bjerke, a broker employed by Davis, Skaggs, for churning his securities account and for making investments that were unsuitable for him. Following a trial before the court, the district court found for Follansbee on his churning claim and for the defendants on the unsuitability claim. Both Follansbee and the defendants have appealed.
 
 I.
 
 2
 Follansbee graduated from the University of California, Los Angeles with a B.A. degree in Economics. The next several years he spent in seminaries, earning a Bachelor of Divinity degree, and he became an ordained Presbyterian minister. After earlier pastorates, he became an administrator of education programs for the United Presbyterian Church.
 
 
 3
 Before the death of his father in 1966, Follansbee had purchased several small blocks of stock. He kept close watch on the performance of those stocks. He served as executor of his father's estate, and, after payment of taxes and all expenses, divided the remainder among his sister, his brother and himself. In this distribution he received securities valued at approximately $145,000.
 
 
 4
 Beginning in January 1967, the plaintiff maintained an active trading account with Dean Witter. Late in 1967, however, his brother sent him a book written by Edward Jensen and entitled Stock Market Blueprints. Follansbee was impressed with the book and wanted someone with Jensen's philosophy to handle his account. His brother, who knew Jensen, obtained a recommendation of Chester Bjerke, who had helped in writing Jensen's book. Bjerke was conveniently located in the Sacramento office of Merrill Lynch.
 
 
 5
 In February 1968, Follansbee met with Bjerke to discuss a transfer of his account. The plaintiff testified that he told Bjerke that he wanted to be conservative and to protect his capital. On a new account form, however, Bjerke checked "Quality Growth" as the plaintiff's investment objective, rather than "Safety of principal and income." This was after the plaintiff had told Bjerke that he wanted his account handled more actively than it had been, and there was a discussion between the two of the general investment philosophy to be followed. Bjerke recommended that they buy stocks of companies in emerging industries and hold them for some six months or longer until the stock peaked. Bjerke expressed the view that the returns from a more conservative approach would not keep pace with inflation. The plaintiff expressed agreement with that approach, and he transferred securities worth approximately $138,000 to Merrill Lynch to be handled by Bjerke.
 
 
 6
 Follansbee's account was handled by Bjerke at Merrill Lynch for approximately one year. During that time there were 39 trades, and most of the sales were of stocks held for less than six months. During that time, however, the value of the plaintiff's portfolio increased by approximately $25,000. The plaintiff, of course, was highly pleased. During the early years of their association, he introduced Bjerke to friends as "the boy wonder of Wall Street." When Bjerke transferred from Merrill Lynch to Davis, Skaggs, the plaintiff went with him.
 
 
 7
 In the spring of 1969, Bjerke and the plaintiff discussed strategy in the handling of plaintiff's account. They were predicting a generally declining market. They envisioned the realization of capital gains only by purchasing securities in the short-term troughs and riding the short-term wave to its peak. This would result in average holding periods of substantially less than six months as, of course, had been the case at Merrill Lynch. The plaintiff approved and agreed to that strategy.
 
 
 8
 Moreover, because they foresaw a generally declining market, Bjerke suggested that profits might be made through short selling. The plaintiff agreed and there were some short sales protected by stop-loss purchase orders.
 
 
 9
 Thus, there were frequent transactions in the account at Davis, Skaggs, just as there had been at Merrill Lynch.
 
 
 10
 The plaintiff continued to read and study investment materials. Bjerke organized a seminar group which met once a week for an hour. The plaintiff testified that he attended approximately 65 per cent of those meetings. Collectively, the group subscribed to a number of investment advisory reports and each of these was circulated among the members. During the meetings the discussions were wide-ranging and included discussions of the prospects of particular industries and of particular companies within an industry. With this and the plaintiff's reading of reports of financial services, the plaintiff from time to time was able to suggest to Bjerke further investigation of potential investment prospects.
 
 
 11
 Among the companies discussed during the meetings of the seminar was one known as Optical Coating. Bjerke regarded it as an emerging growth company. It had been thoroughly investigated by Davis, Skaggs and by Bjerke, and Bjerke himself, had been in touch with its management. The plaintiff, too, studied its financial statements and became excited about it. There were several acquisitions of its stock until it became a major part of the portfolio. The plaintiff still owned 700 shares of that stock at the time of commencement of this action, though its market value then was substantially less than the plaintiff's cost.
 
 
 12
 During another of the seminars there was a discussion of a tax-sheltered, limited partnership venture in the cattle feeding business. The plaintiff also became excited about that. Bjerke, however, cautioned the plaintiff that he should not purchase a limited partnership interest in Cal-Calf if his marginal income tax bracket was less than 39 per cent and that he should first discuss it with his accountant. The plaintiff's marginal income tax bracket was less than 39 per cent, but, in answering a written questionnaire from Bjerke, he falsely stated that his marginal bracket was more than that. Without having discussed the matter with his accountant, he invested $10,000 in the venture.
 
 
 13
 The investment later became a total loss after imposition of a price freeze upon beef without a freeze of the cost of cattle feed.
 
 
 14
 The plaintiff maintained meticulous records of his financial transactions. From his confirmation slips he carefully recorded every purchase and sale. When a purchase was closed out with a sale, he carefully noted whether, for income tax purposes, it was a long-term or short-term capital gain or loss. The amount of the gain or loss, of course, was recorded. He checked the accuracy of the monthly reports he received against his own records, and, habitually, he would value each item in his portfolio and the total valuation on a weekly basis.
 
 
 15
 From time to time the plaintiff withdrew cash from his account. The aggregate total of those withdrawals was approximately $61,000. They were used by the plaintiff in part for educational expenses of his children, for the purchase of two automobiles, one of which was a Mercedes, and for the construction of a swimming pool. The plaintiff, however, did not wish his trading account to be reduced by these withdrawals. For that reason, the advances to him were set up as loans by Davis, Skaggs to Follansbee, and the securities were placed in a margin account to secure repayment of the loans. As interest charges accrued and the market value of the securities in the account declined, the plaintiff in late 1973 began receiving calls to put up additional margin. In June 1974 it was agreed that Follansbee's indebtedness would be reduced by the application of the proceeds of some sales. In July 1974 an obviously unhappy Follansbee requested the return of his stock certificates, an act which the district judge found to betray "a certain degree of naivete." Of course, Bjerke explained to him that they had to be retained since the stock secured the repayment of the loans.
 
 
 16
 In August 1974 Follansbee directed Bjerke to close his account. The loans were repaid out of the proceeds of the sale of all of the plaintiff's stock except for 700 shares of Optical Coating and 800 shares of Keystone S-3 mutual fund.
 
 II.
 
 17
 It is settled that when a broker, unfaithful to the trust of his customer, churns an account in the broker's control for the purpose of enhancing the broker's commission income and in disregard of the client's interest, there is a violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., and Securities and Exchange Commission Rule 10b-5.
 
 
 18
 There must be a concurrence of all three elements, but it is doubtful that any one of the three was proven in this case.
 
 A.
 
 19
 There were many transactions from the beginning of Bjerke's handling of the account at Merrill Lynch, but the excessive trading element of a churning case is not established unless the frequency of the trades was unrelated to the customer's objectives. It is clear that Follansbee was a trader looking for quick, short-term gains, and taking short-term gains and losses requires frequent trading. One may think he would have been wiser not to have looked for the realization of capital gains at all, but to have purchased stocks in corporations thought to have had excellent long-term growth prospects and then to substantially forget them. If there is the expected growth, dividend rates would be expected to increase as would the realizable value of the investment. An expert witness expressed the opinion that a real investor would never sell. Surely it was an overstatement, and, if expected growth does not materialize, there should be a switch to something else. Follansbee simply was not that kind of investor. He wanted quick, realized profits on short-term swings, but that is risky business, as Follansbee himself may now attest.
 
 
 20
 The district judge reached his conclusion of excessiveness in the trading by comparing what happened with Follansbee's initial statement of his objective to conserve his capital. In making that comparison, however, the district judge left unmentioned his specific finding that in the spring of 1969 Follansbee had distinctly agreed to short-term trading even more aggressively than the short-term trading in which he had been engaged.
 
 
 21
 By whatever standard excessiveness is to be measured, see, e.g., Booth v. Peavey Company Commodity Services, 430 F.2d 132, 135 n. 1 (8th Cir. 1970), the many positive steps taken by Follansbee to insure that his account was actively traded negate any inference that the level of trading in his account was inconsistent with his stated investment goals.
 
 B.
 
 22
 It also is clear that the finding that Bjerke controlled the account may not be allowed to stand.
 
 
 23
 If a broker is formally given discretionary authority to buy and sell for the account of his customer, he clearly controls it. Short of that, the account may be in the broker's control if his customer is unable to evaluate his recommendations and to exercise an independent judgment. Mihara v. Dean Witter & Co., Inc., 619 F.2d 814 (9th Cir. 1980); Hecht v. Harris, Upham & Co., 283 F.Supp. 417, 433 (N.D.Cal.1968), aff'd, 430 F.2d 1202 (9th Cir. 1970).
 
 
 24
 In Hecht the customer was a widow. She spent most of her adult life working as a housekeeper and as a tutor of children. Finally, she married a man in whose home she had worked as a housekeeper and, a few years later inherited a small fortune from him. Her account was very actively handled in securities and commodities markets. The district judge found that she knew nothing whatever of commodity trading and that her understanding of securities transactions was minimal.
 
 
 25
 That is not to say, however, that a nonprofessional investor who usually follows the advice of his broker is not in control of his account. No one is likely to form a continuing relationship with a broker unless he trusts the broker and has faith in his financial judgment. Usually the broker will have much greater access to financial information than the customer and will have the support of investigative and research facilities. Such a customer will be expected usually to accept the recommendations of the broker or to disassociate himself from that broker and find someone else in whom he has more confidence.
 
 
 26
 The touchstone is whether or not the customer has sufficient intelligence and understanding to evaluate the broker's recommendations and to reject one when he thinks it unsuitable. Mrs. Hecht was found to lack that capacity. Lacking that capacity, Mrs. Hecht necessarily relied on her broker's expertise. The court had no difficulty concluding on the facts presented that the broker abused her trust. Those factors are lacking here.
 
 
 27
 In Mihara this court affirmed a judgment in favor of a churning-claiming customer upon a finding, as to control, that the customer usually followed the advice of the broker. The court clearly was relying upon Hecht, however, and simply employed a shorthand means of expressing a more complicated concept which was fully elucidated in Hecht. It simply cannot be construed to mean that the most sophisticated investor is not in control of his account simply because he usually follows the recommendations of his broker. As long as the customer has the capacity to exercise the final right to say "yes" or "no", the customer controls the account.
 
 
 28
 In Carras v. Burns, 516 F.2d 251 (4th Cir. 1975), the court stated:
 
 
 29
 Control of trading is an essential element of churning. In the absence of an express agreement, control may be inferred from the broker-customer relationship when the customer lacks the ability to manage the account and must take the broker's word for what is happening.... However, a customer retains control of his account if he has sufficient financial acumen to determine his own best interests and he acquiesces in the broker's management.... The issue is whether or not the customer, based on the information available to him and his ability to interpret it, can independently evaluate his broker's suggestions.
 
 
 30
 Id. at 258-59 (citations omitted). See also Newburger, Loeb & Co. Inc. v. Gross, 563 F.2d 1057, 1070 (2d Cir. 1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978) ("if a customer is fully able to evaluate his broker's advice and agrees with the broker's suggestions, the customer retains control of the account").
 
 
 31
 It was Mrs. Hecht's lack of that capacity which was the foundation of this court's affirmance of the district court's finding that her broker controlled her account.
 
 
 32
 Follansbee was far from an untutored novice. He had a college degree in economics. He had taken a course in accounting. He read corporate financial reports with understanding. He was a regular reader of investment advisory literature. He was an active participant in the investment seminars led by Bjerke, and he kept meticulous records of his trades.
 
 
 33
 Follansbee's acceptances of Bjerke's recommendations were not the passive acquiescences of an uninformed dependent. On some occasions he declined to follow Bjerke's suggestions, and Follansbee generated suggestions which he made to Bjerke for further investigation. With respect to the Optical Coating stock, there was a specific finding that Follansbee made his own analysis of financial reports and materials. It was with great enthusiasm, not passivity, that he moved into that stock and into the investment in Cal-Calf. His enthusiasm for Cal-Calf was so great that he went into that ill-fated venture knowing that it was against Bjerke's advice and misstating his income tax situation to prevail upon Bjerke to handle it.
 
 
 34
 All of these things are strong, characteristic manifestations of a person in complete control of his account. They are completely inconsistent with dependence upon the broker and with the absence of independent evaluations by Follansbee of Bjerke's recommendations. Follansbee's judgment may have been flawed, but the principal ingredient of the flaw was the active pursuit of the quick profit. It led to the ultimate loss of much of his inheritance. But the facts unequivocally shown in the record and the specific findings of the district court lend no support for the ultimate finding that Bjerke was in control of the account.
 
 III.
 
 35
 Denial of Follansbee's unsuitability claim is affirmed for the reasons stated by the District Judge.
 
 IV.
 
 36
 For the reasons stated above, we reverse the district court's entry of judgment for Follansbee on the churning claim and affirm the court's entry of judgment for the defendants on the unsuitability claim.
 
 
 37
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 
 *
 Honorable Clement F. Haynsworth, Jr., United States Senior Circuit Judge for the Fourth Circuit Court of Appeals sitting by designation