Manuel E. NUNES and Dr. Leroy D. Kane

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; Philip C. Poston; and Nancy M. Beckwith.

Civ. A. No. M–84–3118.

United States District Court, D. Maryland.

May 29, 1986.

■■■■■■■■■■■■■■■■

Charles Bagley, IV and Council, Baradel, Kosmerl & Nolan, P.A., Annapolis, Md., for plaintiffs.

David F. Albright, G. Randall Whittenberger, and Semmes, Bowen & Semmes, Baltimore, Md., for defendants.

## MEMORANDUM OPINION

JAMES R. MILLER, Jr., District Judge.

Plaintiffs, Manuel E. Nunes and Dr. Leroy D. Kane, filed this action against defendants, Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), Philip C. Poston, and Nancy M. Beckwith, alleging claims arising out of defendants' handling of plaintiffs' securities accounts (Paper No. 1). On December 30, 1985, this court ordered arbitration of plaintiffs' state law claims and their claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), as amended, 18 U.S.C. § 1961 et seq. (Paper No. 23). Remaining are plaintiffs' claims under § 17(a) of the Securities Act of 1933, as amended, 15 U.S.C. § 77q(a); and § 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 CFR 240.10b–5.

Defendants have filed Motions for Summary Judgment with respect to the claims of both Nunes and Kane (Paper Nos. 33 and 35). Plaintiffs have filed Oppositions to the motions (Paper Nos. 36 and 38), defendants have filed replies (Paper Nos. 39 and 40), and plaintiffs have filed responses to the replies (Paper Nos. 41 and 42). In addition, the court heard argument from counsel on this motion on April 11, 1986 and again on April 16, 1986.

The factual allegations underlying plaintiffs' claims were set out in detail in this court's Memorandum and Order dated April 2, 1985, *Nunes v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 609 F.Supp. 1055, 1057–58 (D.Md.1985). Essentially, plaintiffs allege that defendants, exercising *de facto* control over their accounts, engaged in excessive and unwarranted trading in their accounts for the purpose of generating commissions and fees for themselves, in disregard of the needs and objectives of plaintiffs. Defendants contend, however, that based on the undisputed facts, plaintiffs cannot prove the elements of churning.

The Fourth Circuit has defined "churning" as follows:

"Churning occurs when a broker, exercising control over the volume and frequency of trading, abuses his customer's confidence for personal gain by initiating transactions that are excessive in view of the character of the account. Its hallmarks are disproportionate turnover, frequent in and out trading, and large brokerage commissions."

*Carras v. Burns*, 516 F.2d 251, 258 (4th Cir.1975). It is well settled that churning, as a matter of law, constitutes a deceptive act, actionable under § 10(b) of the 1934 Act and Rule 10b–5. *See, e.g., Costello v. Oppenheimer & Co.*, 711 F.2d 1361, 1368 (7th Cir.1983); *Thompson v. Smith Barney, Harris Upham & Co.*, 709 F.2d 1413, 1416–17 (11th Cir.1983); *Follansbee v. Davis, Skaggs & Co.*, 681 F.2d 673, 676 (9th Cir.1982); *Miley v. Oppenheimer*, 637 F.2d 318, 324 (5th Cir.1981); *Mihara v. Dean Witter & Co.*, 619 F.2d 814, 820 (9th Cir. 1980); *Carras v. Burns*, 516 F.2d at 258; *Landry v. Hemphill, Noyes & Co.*, 473 F.2d 365, 368 n.1 (1st Cir.), *cert. denied*, 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973).

■ In order to establish a claim of churning, a plaintiff must prove three elements: (1) control by the broker over the trading in the account, (2) excessive trading in light of the plaintiff's investment objectives, and (3) intent to defraud or willful and reckless disregard for the investor's interests. *E.g., Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 767 F.2d 1498, 1501 (11th Cir.1985); *Thompson*, 709 F.2d at 1416–17; *Miley*, 637 F.2d at 324; *Mihara*, 619 F.2d at 821. In order

to prove churning, all three elements must be proven.

In the present case, this court is of the opinion that the relevant facts are undisputed and that, even viewing these facts in the light most favorable to the plaintiffs, *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985), plaintiffs in this case are unable to prove the elements of churning.

Plaintiffs allege that defendants were exercising *de facto* control over their accounts. While control is "clearly established" where the broker has discretionary control over the account, *Costello,* 711 F.2d at 1368, there were no such agreements here. Control may also be present, however, where a customer is unable to evaluate the broker's recommendations and to exercise an independent judgment. *Follansbee,* 681 F.2d at 676–77. As the Fourth Circuit noted in *Carras:*

> "Control of trading is an essential element of churning. In the absence of an express agreement, control may be inferred from the broker-customer relationship when the customer lacks the ability to manage the account and must take the broker's word for what is happening.... However, a customer retains control of his account if he has sufficient financial acumen to determine his own best interests and he acquiesces in the broker's management.... The issue is whether or not the customer, based on the information available to him and his ability to interpret it, can independently evaluate his broker's suggestions. [The customers do] not have to prove both that they lacked the competence to manage the account and also that they gave control to [the broker]. Lack of competence itself may give rise to an inference of control."

516 F.2d at 258–59. It is on this basis that plaintiffs in the present case contend that defendants controlled their accounts.

■ With respect to plaintiff Nunes, the court finds that no genuine dispute of fact exists as to whether Nunes had "sufficient financial acumen to determine his own best interests," and that he was exercising independent judgment and control over his account. It is undisputed that Nunes was employed as a teacher of various subjects and as a lead mental technician at a children's center (Paper No. 33, Nunes dep. at 4–5); that he has had prior accounts with numerous stockbrokers, including previous experience trading on margin and trading options (*id.,* Nunes dep. at 33, 130–40); that he had solicited the investment advice of Dow Theory Forecast, Inc., when with a previous broker (*id.,* Nunes dep. at 123); and that he had filed previous lawsuits against several of his prior brokers for, *inter alia,* excessive trading (*id.,* Nunes dep. at 6–8). Nunes acknowledged that he knew how to seek the advice of brokers (*id.,* Nunes dep. at 147); that he knew that commissions would be charged for placing trades (*id.,* Nunes dep. at 25–26); that he knew how to read monthly account statements (*id.,* Nunes dep. at 26–27); and that he is still trading options on margin with another broker (*id.,* Nunes dep. at 183–84, 189). Finally, defendant Poston testified that all of Nunes' trades except for one were unsolicited (Paper No. 38, Poston dep. at 51, 56, 57).

Nunes makes several statements which he contends create issues of fact. First, Nunes claims that he was compulsive (Paper No. 33, Nunes dep. at 13), and that defendants assured him that they would watch over his account (*id.,* Nunes dep. at 22). Second, Nunes contends that many of his trades were unsolicited, and that he followed the brokers' advice on everything (*id.,* Nunes dep. at 53). Finally, Nunes contends that his position is supported by the statement of Poston's secretary, Robin Buckingham, that during the relevant time period she had quite often referred Nunes to Poston or Beckwith because she felt that the trades requested by Nunes were unsuitable (Paper No. 36, Buckingham dep. at 78).

In *Leib v. Merrill Lynch, Pierce, Fenner & Smith,* 461 F.Supp. 951 (E.D.Mich.1978),

*aff'd mem.*, 647 F.2d 165 (6th Cir.1981), Chief Judge Feikens listed the factors to be taken into account in determining whether a broker has assumed control of a non-discretionary account as follows:

"In determining whether a broker has assumed control of a non-discretionary account the courts weigh several factors. First, the courts examine the age, education, intelligence and investment experience of the customer. Where the customer is particularly young, ... old, ... or naive with regard to financial matters, ... the courts are likely to find that the broker assumed control over the account. Second, if the broker is socially or personally involved with the customer, the courts are likely to conclude that the customer relinquished control because of the relationship of trust and confidence.... Conversely, where the relationship between the broker and the customer is an arms-length business relationship, the courts are inclined to find that the customer retained control over the account.... Third, if many of the transactions occurred without the customer's prior approval, the courts will often interpret this as a serious usurpation of control by the broker.... Fourth, if the customer and the broker speak frequently with each other regarding the status of the account or the prudence of a particular transaction, the courts will usually find that the customer, by maintaining such active interest in the account, thereby maintained control over it."

*Id.* at 954–55 (citations omitted). *See also M & B Contracting Corp. v. Dale*, 601 F.Supp. 1106, 1111 (E.D.Mich.1984).

Here, there can be no question, in light of Nunes' previous accounts and lawsuits, that Nunes is experienced in the stock market and sophisticated in financial matters in general. Notwithstanding his claims of compulsiveness and Buckingham's statements about him, there can be no rational dispute, in light of Nunes' extensive experience in stock market matters, that he is not one who is "naive with regard to financial matters." Furthermore, his argument that

he would have stopped trading had he been told to do so (Paper No. 33, Nunes dep. at 16) is belied by the fact that even after his experience at Merrill Lynch, Nunes continues to trade options through another broker. In light of such evidence, Nunes cannot create an issue of fact simply by claiming that he would have stopped trading had this been proposed by defendants. *Cf. Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct"). Accordingly, there is no rational factual dispute that Nunes possessed the intelligence and experience to "independently evaluate his broker's suggestions."

There is no indication that Nunes' relationship with defendants was at any time anything other than an arms-length business relationship. Also, there is no evidence that any of the transactions involved were made without Nunes' prior approval, and the record is undisputed that Nunes maintained an active interest and involvement in his account. Although it appears that a dispute exists as to the number of trades which were solicited, the court finds that this dispute is not material. While an inference of control may be drawn where a customer routinely follows the recommendations of the broker, *Mihara*, 619 F.2d at 821, this "cannot be construed to mean that the most sophisticated investor is not in control of his account simply because he usually follows the recommendations of his broker. As long as the customer has the capacity to exercise the final right to say 'yes' or 'no', the customer controls the account." *Follansbee*, 681 F.2d at 677. *See also M & B Contracting Corp.*, 601 F.Supp. at 1111. In the present case, even assuming that many trades were solicited, this would not amount to control since Nunes clearly possessed "sufficient intelligence and understanding to evaluate the broker's recommendations and to reject one when he thinks it unsuitable." *Follansbee*, 681 F.2d at 677.

Nunes testified that defendants sent him confirmation slips for each trade and that he looked at those slips (Paper No. 33, Nunes dep. at 27–28). His retention of the right to say "yes" or "no" is demonstrated by his recognizing, through confirmation slips sent to plaintiff for each transaction, and complaining about two transactions apparently transacted in his account in error (Paper No. 33, Nunes dep. at 60–70).

Retention of such control over the account by Nunes is also demonstrated by the undisputed interest which he maintained in the account. Nunes himself claims that while Poston was his account executive, Nunes had phone calls with him almost daily and went to see Poston at his office 2–3 times each month (*id.*, Nunes' Answers to Merrill Lynch Interrogatory No. 16). Thus, plaintiff has failed to demonstrate the existence of a factual issue as to each of these factors governing control. The court concludes as a matter of law, based upon the undisputed material facts, that Nunes was exercising control over his account.

As to plaintiff Kane, the court also finds that he had "sufficient financial acumen to determine his own best interests," and that he was exercising independent judgment and control over his account. Kane is employed as an English teacher and also owns and manages a small business (Paper No. 35, Kane dep. at 2, 5). It is undisputed that Kane has had prior accounts with other brokers, and has previous experience trading options (*id.*, Kane dep. at 6). He testified that he received and read confirmation slips sent by Merrill Lynch for each trade (*id.*, Kane dep. at 11).

Kane argues that issues of fact remain, because he testified that he was not totally familiar with covered calls and options (*id.*, Kane dep. at 5); and that the writing of covered calls was suggested by Poston as a way to meet margin calls (*id.*, Kane dep. at 11–12, 48).

Kane, however, had previous experience in the stock market and in options trading which demonstrate that he was not "naive with regard to financial matters." There is no evidence that Kane's relationship with defendants was ever anything other than an arms-length business transaction, and there is no evidence that the transactions allegedly resulting in the churning of Kane's account were done without Kane's prior approval. Finally, like Nunes, Kane admits to telephone calls with Poston or Buckingham almost daily (*id.*, Kane's Answer to Merrill Lynch's Interrogatory No. 16). Such active interest and involvement of Kane in his account is indicative of his retention of the right to say "yes" or "no", and hence his retention of control over the account. Thus, the court finds that Kane cannot prove control, an essential element of churning.

█ In addition, defendants have submitted the affidavits and amended affidavits of Joanne Rock and Caryl Moore, internal auditors for Merrill Lynch, who state that they have conducted reviews of the accounts of Nunes and Kane to determine the profit or loss in the account (Paper Nos. 43–44). Rock states that from June 25, 1982 through June 24, 1983, Nunes made a profit in his account totalling $26,-744.61. Moore states that from September 25, 1982 through May 27, 1983, Kane made a profit in his account totalling $1,917.19.[1] Plaintiffs, however, have submitted the affidavits of Thomas J. Loughran, who states that he has conducted liquidation value analyses of Nunes' and Kane's accounts, and according to his calculations, Nunes lost $15,386.34 and Kane made a profit of $169.19 (Paper No. 45).

The disparity in the figures appeared to result primarily from a dispute between the parties as to the proper dates to be used in calculating profit or loss. Counsel were therefore directed to confer to see if some

---

1. Kane alleges that defendants excessively traded his account between September 25, 1982 and June 24, 1983 (Paper No. 1, § 62). It is undisputed, however, that all securities were transferred out of the account by May 27, 1983 (*see* Paper No. 45, Declaration of Thomas J. Loughran; Paper No. 47, Exh A). Nunes alleges that defendants excessively traded his account between June 26, 1982 and June 24, 1983 (Paper No. 1, § 17).

understanding could be reached as to the proper figures. After attempting unsuccessfully to resolve the issue, the parties sent letters to the court explaining their respective positions. Plaintiffs contend that all options and securities in their accounts should be valued as of the date that the first option was transferred out of their accounts (Paper No. 47). Using this method, plaintiffs contend, valuing Nunes' account as of May 25, 1983 results in a loss of approximately $1,476.00, and valuing Kane's account as of May 17, 1983 results in a loss of approximately $22,000.00. Defendants contend that the options and securities should be valued as of the actual date that each was transferred out of the account (Paper No. 46). They contend that calculating profit or loss in this manner results in the profit set forth in the Moore and Rock affidavits.

Although plaintiffs claim that their account was churned during the entire period of the account, they attempt now to calculate damages in a way which ignores the profit made in the accounts during certain time periods. Nevertheless, plaintiffs do not dispute the profits which defendants contend were made during those time periods, and they accepted the benefits of those time periods when the accounts were transferred out from Merrill Lynch. Thus, the court finds, as a matter of law, the plaintiffs' proposed calculation is improper, and that there is no genuine dispute of any relevant facts leading to the conclusion that plaintiffs each made a profit in their accounts.

Plaintiffs contend that, assuming that they made a profit in their accounts, churning can be shown even in the absence of a decrease in the value of a plaintiff's portfolio. Although certain courts have noted in dicta that a claim for churning may exist regardless of whether the investor's portfolio increased or decreased in value as a result of the trading, see, e.g., Miley, 637 F.2d at 326, plaintiffs have offered no case in which damages were awarded to an investor whose account had made a profit.

Several possible measures of recovery have been suggested for churning cases, including recovery by plaintiff of his out of pocket loss, recovery by plaintiff of his loss of bargain by awarding damages based on the yield of a properly managed investment account, and quasi-contractual recovery requiring the return of profits or commissions earned by the dealer. See Jacobs, "The Measure of Damages in Rule 10b–5 Cases," 65 Geo.L.J. 1093, 1137–39 (1977); Note, "Churning by Securities Dealers," 80 Harv.L.Rev. 869, 883–85 (1967). Each of these measures of damages, however, has shortcomings which make it inappropriate for uniform application. Recovery under the loss of bargain method has been criticized as speculative and conjectural, since even properly managed accounts may suffer losses. Jacobs, *supra*, at 1138. Quasi-contractual recovery, on the other hand, may be inappropriate since the damage caused by churning bears no rational relationship to the amount of commissions earned by the dealer. Jacobs, *supra*, at 1139; Note, *supra*, at 884. Finally, out of pocket recovery has been questioned, because it assumes that all transactions were improper and because it frustrates the purposes of the rule where an account is churned but still makes a profit. Jacobs, *supra*, at 1138; Note, *supra*, at 884. Considering the nature of an action for churning, it appears that no consistently appropriate measure of damages exists, but that different theories of recovery may be proper in different cases, depending upon the particular facts of each case. See Jacobs, *supra*, at 1139.

In the present case, plaintiffs contend that, even assuming that their accounts made a profit, they are entitled to recovery. "Although a profit to the customer is not as such a defense to a charge of churning, it is unlikely that a dealer will be held to have churned unless it can be demonstrated that the customer has suffered from the handling of the account." Note, *supra*, at 878. In the present case, the undisputed facts demonstrate that both plaintiffs desired to trade in the speculative option market, which inherently requires frequent

trading. The facts also show that both plaintiffs' accounts made a profit. Under such circumstances, the court finds that the undisputed facts demonstrate that plaintiffs have not been harmed. Therefore, summary judgment is appropriate on this basis as well.

For these reasons, an Order will be entered granting defendants' Motions for Summary Judgment, and entering judgment in favor of defendants.