**M & B CONTRACTING CORPORA-TION, a Michigan corporation, Plaintiff,**

**v.**

**David DALE and Merrill, Lynch, Pierce, Fenner & Smith, Inc., a subsidary of Merrill, Lynch and Company, Inc., a Delaware corporation, jointly and severally, Defendants.**

**Civ. A. No. 82–72880.**

United States District Court, E.D. Michigan, S.D.

Nov. 14, 1984.

David Dale ("Dale") and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), claiming violation of various sections of the Securities Acts, 15 U.S.C. § 78j(b), 15 U.S.C. § 77q(a), and rules thereunder, and the rules of the New York Stock Exchange.

Plaintiffs claim defendants: a) totally disregarded the needs, objectives and instructions of M & B as to the type of investment account it wanted, and how it was to be handled; b) engaged in excessive and unwarranted trading and churned M & B's account to generate commissions and interest income for themselves, in total disregard of the needs and desires of M & B; c) failed to inform M & B of the risk involved in margin trading, short term in-and-out trading, non-diversification, and other highly improper and speculative trading activity that was undertaken with M & B's account; d) made fraudulent misrepresentations to persuade M & B to commence trading on a margin basis; and e) failed to explain to M & B the nature and extent of the risk to which M & B was exposing its operating capital, and the business risk both to the capital and the future of the corporation. Plaintiff also claims that Merrill Lynch failed properly to supervise Dale, who was the account executive in charge of the account.

The three issues for determination are:

1) Whether the broker (Dale) had control of M & B's account, and, if so, whether the activity therein was excessive and for the purpose of generating commissions and interest income for defendants;

2) Whether the broker made fraudulent misrepresentations to M & B in connection with the purchase or sale, and, if so, whether M & B relied upon such misrepresentation; and

3) Whether Merrill Lynch properly enforced its internal compliance rules with respect to the supervision of the M & B account.

Alternately stated, the case presents the question of to what extent a corporation managed by knowledgable, educated and

Dickinson, Wright, Moon, Van Dusen & Freeman by Robert S. Krause, Robert E. Kinchen, Detroit, Mich., for plaintiff.

Butzel, Keidan, Simon, Myers & Graham by Douglas G. Graham, Dennis K. Egan, Detroit, Mich., for defendants.

## OPINION

GILMORE, District Judge.

This is an action by M & B Contracting Corporation, ("M & B"), against defendants

sophisticated businessmen is responsible for the results of its own actions in choosing to invest in the stock market.

The Court finds no basis for this lawsuit, and will order a judgment of no cause for action.

The action concerns a security account maintained between May 1980 and July 1982 by M & B with Merrill Lynch. The account was serviced by Dale, a Merrill Lynch account executive. Principals in the action are Sebastian J. Mancuso ("Senior"), founder, chairman of the board, and majority shareholder of M & B; Sebastian D. Mancusso ("Danny"), Senior's son, secretary, and 24 percent shareholder of M & B; Peter C. Saputo ("Saputo"), vice-president of finance of M & B; Dale; and Russell Mann ("Mann"), the branch manager of Merrill Lynch's Bloomfield Hills office.

Saputo, who was a friend of Dale as the result of playing in the same softball league, opened an M & B account with Merrill Lynch in May 1980. At the time M & B was a national heavy construction firm specializing in road construction, and was the 24th largest heavy contractor in the United States.

Senior was the Company's principal decision maker, who reserved the right to make all major decisions regarding the Company and its business. The Company's principal contact with Dale was Saputo, who was a University of Detroit graduate with a bachelor's degree in accounting, who had been a Certified Public Accountant since 1968. From the time of his graduation from the University of Detroit in 1965 until 1972, he was an auditor for Price Waterhouse and Company, and from 1972 to 1976 vice-president of finance for Euro Corporation, a residential building firm in Michigan and Florida. In 1976, he became vice-president of finance at M & B, with responsibility for overseeing all of its accounting functions and financial operations.

Dale and Saputo started talking about investment of funds and excess working capital of M & B. M & B had most of its working capital tied up in certificates of deposit, and wanted a more liquid type of

account in which the funds could be readily available and yet yield a higher return.

In May of 1980, Saputo discussed the idea of an investment program for M & B, and Senior agreed to open a corporate account with Merrill Lynch. The Company had approximately $3,000,000 in excess funds to invest, and initially invested in a Merrill Lynch ready asset trust, a money market fund. Senior hoped the rate of return on the trust would exceed that of the certificates of deposit. The first investment was in the amount of $750,000. Subsequently, additional funds were made available, and the total initial deposits were approximately $1,600,000.

In early June of 1980, Saputo, on behalf of M & B, authorized the purchase of a $100,000 bond in Central Power and Light, a $250,000 bond in Detroit Edison, and a $100,000 bond of Oklahoma Gas and Electric. Subsequently, the account began to trade in stocks, and the nature of these trades raises the principal dispute in this case.

It is clear that from June 1980 until December 1980, and early 1981, the Corporation engaged in extensive short-term in-and-out trading. Most trades were in 10,000 share lots, under instructions from Saputo.

It would not be helpful to detail all of the trades, but suffice it to say that some stocks would be held as briefly as one day before sale, and others would be held as long as two to three weeks. Many stocks were bought and sold and then bought again, and there was constant in-and-out trading. From early June 1980 until the end of January 1981, there were more than 90 transactions.

In September of 1980, Saputo placed the account on margin, with Senior's approval. It is clear that both Senior and Saputo understood the risks of margin, that they would be borrowing money to buy stocks, and would be paying Merrill Lynch interest. Saputo understood that borrowing was involved, that the stocks were pledged, that a certain level of equity in stocks

would have to be maintained, and that interest would have to be paid. At the time they went on margin, Saputo and Senior discussed the idea and were well aware of the risks involved and the margin interest required.

The account remained profitable through December of 1980, but in January and February of 1981 the market turned around, and plaintiff began to have losses. Plaintiff continued to trade, however, through 1981, and finally closed the account in 1982, with a loss of approximately $2,000,000. Plaintiff seeks to recover $2,035,000 for trading losses, and $806,000 lost interest that it claims it would have received had the money remained in the ready asset account.

The record is clear that Dale suggested, first, the purchase of bonds, and secondly, the purchase of stocks. It is equally clear that Saputo and Senior were well aware of all trades, and approved of every trade that was made. In the fall of 1980, when the account went on margin, Dale and Saputo would talk several times a day. In fact, they talked so much that a special phone was installed in M & B so that Saputo could carry on his conversations about the market with Dale without tying up M & B's regular phones.

Saputo approved every stock purchased. Dale generally made the recommendations for purchase, but no stock was ever purchased without Saputo's specific approval, and many times Saputo turned down recommendations made by Dale. The same is true of sales: no stock was sold without the approval of Saputo.

It is clear that Saputo also knew the commissions charged by Merrill Lynch, received a confirmation slip from Merrill Lynch immediately after every trade, and at the end of every month, a monthly statement showing all activity for the month. These monthly statements disclosed the stocks purchased and sold, the amount, price, commission, and all margin interest paid. They also showed the cash balance in the account, the size of any margin balance, and the current market value of all open positions.

As pointed out earlier, the account was profitable through 1980, but in January of 1981 the market started to fall and did not rebound as many expected. At the close of business on January 29, 1981, M & B's account, if closed, would have suffered an overall loss of $233,598.

On the morning of January 29, 1981, a disputed conversation took place among Dale, Mann and Saputo. Saputo claims that he never had the conversation, but both Dale and Mann testified to it and its detail. Their testimony and the documentation offered by Dale convinces the Court that such conversation took place, and the Court finds as a matter of fact that the conversation did take place. In that conversation, Mann reviewed the status of the account, including the margin debt, the equity and losses, and asked Saputo whether M & B could afford the risk of its positions, and whether the funds were needed for M & B's business. He reminded Saputo that, although Merrill Lynch believed the market would improve, Merrill Lynch could be wrong, and the account could get into serious trouble. The point of the call was to warn Saputo of the possibility of serious loss in the account so that they could see if he (Saputo) and Senior wanted to make any change in the nature of the account or the volume of trading. Saputo told Mann and Dale that he would consult with other officers and with Senior and would get back to them, and later called Dale to tell him that M & B would hold its position.

By the end of March 1981 M & B's account showed an overall loss of more than $1,000,000, and the account continued to lose until it was finally closed in 1982 with more than a $2,000,000 loss.

Crucial to decision is the testimony of Dale and Saputo. There is no question that, over all, Dale was extremely evasive and tried so hard to put his testimony in the best possible light that he lost much of his credibility. There is also no question that Dale was anxious to keep the account moving, and that he encouraged much of

the trading. His testimony did not help the defendant. M & B was Dale's best customer, and it is obvious that he was trying to make as many trades as he could to gain commissions. By the same token, Dale was impressed with Saputo's knowledge and experience, and spoke truthfully of his impression of Saputo as a capable, informed businessman with a very successful company. At one point, he stated that Saputo was probably the best informed client in the office.

It is clear to the Court that Saputo was most responsible for what happened here. As chief financial officer, he had an obligation to watch the investments like a hawk, and there is no question but that he did. The Court does not find his testimony credible when he says that he placed his complete trust in Dale and simply went along with Dale's recommendations without any independent inquiry. Nor does the Court accept his protestations of ignorance about the market and his total reliance upon Dale's recommendations. Saputo maintained extremely careful records, and had an extensive background in business. He was careful and conscientious in all of his financial duties with M & B. The records he kept of the sales and purchases were extremely detailed, and they enabled him to determine, at any given moment, the exact condition of the account. He was a CPA with extensive experience in business. Every trade made by Dale was approved by Saputo, and he generally did not approve transactions until he had obtained the approval of Senior.

It is significant that he felt the reasons given him by Dale for each and every transaction made sense. It is clear that Saputo was in control of the account since he made an independent evaluation of each recommendation. He testified at one point that when M & B moved out of the ready asset account and into common stocks it was an exciting time because the market was moving up. He kept meticulous records, talked with Senior almost daily about the activity of the account, and was very involved in and informed about the account from the start.

His protestations that he did not thoroughly understand margin accounts and option trading are not credible. He may not have been an expert in the market, but he knew enough to know that trading on margin and in options was very risky. It is undisputed that he understood the concept of margin trading, and he must have realized that by the time margin trading began M & B's account had come a long way from the conservative liquid investment account he testified had been M & B's initial investment objective.

In fact, Saputo's entire testimony about M & B's investment objectives is hard to believe. He claims that its initial goal was a safe, readily available liquid investment that would earn a respectable and consistent return, and he claims that objective never really changed. This is refuted completely by the facts. M & B went into a pattern of short term, roller coaster, in-and-out, margin and option trading that was about as far from a safe, readily available liquid investment as possible. There is little question that he knew exactly what he was doing. This is borne out by months of careful record keeping and reports to stockholders, hundreds of conversations between him and Dale, and almost daily conversations between him and Senior.[1]

The first legal issue is whether the actions described above constitute churning, or whether the broker had control over M & B's account, and if so, whether the activity was excessive for the purpose of

---

1. The question of suitability has been raised by plaintiff under a general rule that provides the broker should "know his customer." Whatever the legal position as to whether a private cause of action can arise because of lack of suitability, it is clear that the stocks that were purchased were suitable for M & B. Generally, they were quality stocks. Most were of investment grade, or good quality, although a few were speculative or high risk. Saputo approved all investment decisions. He was aware at all times of M & B's financial situation and the effect of these stock purchases on M & B's position. It is clear that any suitability claims are without foundation because of the clear control and knowledge of Saputo, and approval of Senior.

generating commissions and interest income for the defendants. Three elements are necessary to establish churning: 1) control of the account by the broker; 2) excessive trading in light of the customer's objectives; and 3) scienter, which is defined as intent to defraud, or a reckless disregard by the broker of the customer's best interests.

■ Indicia of control are: 1) the identity, age, education, intelligence, and investment and business experience of the customer; 2) the relationship between the customer and the account executive, that is, whether it is an arms-length one or a particularly close relationship; 3) knowledge of the market and the account; 4) the regularity of discussions between the account executive and the customer; 5) whether the customer actually authorized each trade, and 6) who made the recommendations for trades.

Plaintiff claims that control in the account executive was established because the client routinely followed the broker's recommendations. It cites *Mihara v. Dean Witter & Co., Inc.*, 619 F.2d 814 (9th Cir. 1980). However, in *Follansbee v. Davis, Skaggs & Co. Inc.*, 681 F.2d 673 (9th Cir. 1982), the court rejected M & B's interpretation of *Mihara*, holding:

> That is not to say, however, that a non-professional investor who usually follows the advice of his broker is not in control of his account.... (*Mihara*) simply cannot be construed to mean that the most sophisticated investor is not in control of his account simply because he usually follows the recommendations of his broker. As long as the customer has the capacity to exercise the final right to say "yes" or "no", the customer controls the account.

*Id.* at 677.

Chief Judge Feikens, in *Lieb v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951 (E.D.Mich.1978), *aff'd mem.*, 647 F.2d 165 (6th Cir.1981), defined control in the following manner, and listed several relevant factors:

> In determining whether a broker has assumed control of a non-discretionary account the courts weigh several factors. First, the courts examine the age, education, intelligence and investment experience of the customer.... Second, if the broker is socially or personally involved with the customer, the courts are likely to conclude that the customer relinquished control because of the relationship of trust and confidence.... Conversely, where the relationship between the broker and the customer is an arms-length business relationship, the courts are inclined to find that the customer retained control over the account.... Third, if many of the transactions occurred without the customer's prior approval, the courts will often interpret this as a serious usurpation of control by the broker.... Fourth, if the customer and the broker speak frequently with each other regarding the status of the account or the prudence of a particular transaction, the courts will usually find that the customer, by maintaining such active interest in the account, thereby maintain control over it.

*Id.* at 954–55.

■ It is clear to the Court that M & B, through Saputo and Senior, maintained control over this account. Saputo was a sophisticated businessman and a CPA, well acquainted with financial matters. Senior had become a tremendously successful builder, graduating, as he said, from the "school of hard knocks." M & B's officers were not naive regarding financial matters. In addition, the relationship between M & B and Dale was one of strictly business. Saputo and Senior viewed the relationship as a professional one, and there is no question that Saputo and Dale dealt on an arms-length basis. Dale did not take advantage of Saputo because of their former relationship on the softball team. Nor was there usurpation of control by Dale, since he always had M & B's prior approval. Finally, there was regular consultation between the parties as to the trades. At no time was a trade made without consultation.

It is thus clear that control, the first essential element of churning, has not been established by plaintiff. Dale did not have

**1112**

control of the account; Saputo did. Nor was there excessive trading in light of the customer's objectives. It is not entirely clear when M & B's objectives changed, but they did change radically from their cautious beginnings. Finally, although Dale was both ambitious and less than honest with the Court in his testimony, the Court cannot find adequate scienter necessary for churning. There is no showing that he sought to defraud plaintiff, and no showing of a reckless disregard. It therefore is clear that there was no churning in this account.

The second major claim is that the broker made fraudulent misrepresentations to M & B in connection with the purchase and sale of securities, and M & B relied upon such misrepresentations to its own detriment. It is clear to the Court that defendants are not liable for fraud, whether it be alleged under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), or under the Michigan common law.

■■■ To establish a case for fraud by a broker-dealer under Section 10(b) and Rule 10b(6–5) thereunder, it is necessary that the defendant implement a deceptive or manipulative practice in connection with the purchase or sale of a security. *See Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017 (6th Cir.1979). To establish a fraud claim in this case, it would be necessary to show that Dale made material misrepresentations or non-disclosures to M & B in connection with the purchase or sale of a security, that they were either made with the intention of defrauding M & B or were made recklessly, that M & B relied on these misrepresentations, and that they were the proximate cause of damages.

The proofs in this case simply do not show such misrepresentations. There were no material misrepresentations, or non-disclosures by Dale to plaintiff. Saputo was fully informed about everything that went on in the account; Saputo had full access to the research work of Merrill Lynch; Saputo discussed extensively every transaction with Dale, and to suggest that somehow or other Dale defrauded Saputo and Senior is without any foundation in the record.

The Court, having found no churning and no fraudulent misrepresentations to M & B in connection with the purchase of stock upon which M & B relied, the question of whether Merrill Lynch properly enforced its internal compliance rules with respect to the supervision of M & B's account is moot.

In sum, the Court finds no churning and no fraudulent misrepresentations, and orders the entry of a judgment of no cause of action. Costs may be taxed. This opinion constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).