Carol G. Green, Clerk Kansas Supreme Court Kansas Judicial Center, 3rd Floor Topeka, Kansas 66612
Dear Ms. Green:
You request an opinion on behalf of the Chairman of the Supreme Court Nominating Commission (Commission) concerning the propriety of certain questions that appear on the application form for appellate court candidates. The questions address the age, marital/family status, religious affiliation and health of the applicant. We review each question in light of the Kansas Acts Against Discrimination (KAAD), the Kansas Age Discrimination in Employment Act (KADEA) and the Americans With Disabilities Act (ADA).
"1. Given minimum age qualifications and a mandatoryretirement age, may the Commission ask on its nominationform the date of birth and age of potential nominees?"
The Kansas Age Discrimination in Employment Act (KADEA), K.S.A. 44-1111 et seq., prohibits employment practices based upon age which "limit, deprive or tend to deprive any person of employment opportunities or otherwise adversely affect the person's status as an applicant for employment." K.S.A. 44-1113. One of these prohibited employment practices is for an "employer", because of the applicant's age, "to bar . . . the person from employment." K.S.A. 44-1113(a)(1). As used in this Act, the term "employer" includes the State of Kansas. K.S.A. 44-1112(d). [The KADEA generally parallels the federal Age Discrimination in Employment Act (ADEA) at29 U.S.C. § 621 et seq., however, the ADEA does not apply to state court judges and nominees for those positions because the federal law definition of "employee" exempts appointees on policy making levels.Gregory v. Ashcroft, 501 U.S. 452, 115 L.Ed.2d 410,111 S.Ct. 239 (1991).]
The Commission is established by the Kansas Constitution and its purpose is to nominate and submit to the Governor the names of persons for appointment to the Kansas Supreme Court and the Kansas Court of Appeals. Kan. Const., Art. 3, § 5(d), K.S.A. 20-133,20-3004. The Commission is comprised of attorneys and one non-attorney who serve fixed terms and who are compensated for their services and reimbursed for expenses from the state treasury. K.S.A. 20-120, 20-124,20-125, 20-137, 20-138. When a vacancy in the appellate courts occurs, it is the practice of the Clerk of the Appellate Courts to send written notice to all Kansas attorneys informing them of the vacancy and inviting applications to be submitted to the Commission. The Commission interviews the applicants and submits three names to the Governor who then makes a selection. K.S.A. 20-132, 20-3007. [The three nominees are subject to a Kansas Bureau of Investigation background check and, as part of that investigation, are required to complete an information form which requests some of the same information found on the Commission's application (i.e. date of birth, names and age of children). We address in this opinion only the propriety of the information requested by the Commission.]
While the Commission does not itself employ the candidate, it plays an integral part in the process by which appellate court judges are employed. State exrel. Stephan v. Adam, 243 Kan. 619 (1988). Title VII of the Civil Rights Act of 1964 and the Kansas Acts Against Discrimination prohibit the same employment practices that the KADEA prohibits except Title VII and its state counterpart protect job applicants from discrimination based upon race, color, religion, sex and national origin. Federal court decisions concerning Title VII are persuasive authority in KAAD and KADEA cases. Woodsv. Midwest Conveyor Co., 231 Kan. 763 (1982), KansasState University v. Kansas Comm'n on Civil Rights,14 Kan. App. 2d 428 (1990); Davis v. Wesley RetirementCommunities, Inc. 913 F. Supp. 1437, 1443 (D.Ks. 1995). The Title VII cases that address the issue of who the employer is in a situation where the entity in question does not actually employ the person but plays a decisive role in the employment process supports our conclusion that the Commission is an agent for the State of Kansas and must abide by the KADEA because it is the gatekeeper to appellate court employment. See Scott v.City of Topeka Police and Firefighter Civil ServiceCommission, 739 F. Supp. 1434 (D.Kan. 1990) (city of Topeka liable under Title VII for discriminatory acts of its civil service commission which failed to certify a woman as a candidate for a firefighter position); Rivasv. State Board for Community Colleges, 517 F. Supp. 467
(D. Colorado 1981) (state council with authority to confirm teaching appointments at community colleges was sufficiently involved with the employment process for Title VII purposes). In Livingston v. Ewing,601 F. Supp. 1110 (10th Cir. 1979) the state museum adopted a policy prohibiting non-Indians from selling merchandise on museum grounds. Title VII exempts from its prohibition against racial discrimination any employment practice that grants preferential treatment to Indians. Plaintiff/non-Indians argued that the exemption did not apply because there was no employment relationship between the museum and the Indian sellers. The Court concluded that an employment practice is not restricted to a master-servant situation. See alsoSibley Memorial Hospital v. Wilson, 488 F. Supp. 1338
(D.C. 1973) [cited in Livingston] (Title VII applies to those who control access to employment and who deny access by reference to invidious criteria); Puntolilov. New Hamsphire Racing Commission, 375 F. Supp. 1089
(D. New Hampshire 1974) [cited in Livingston] (State Racing Commission liable under Title VII to harness race driver because it controlled access to employment by virtue of its powers to assign stall space at racing parks).
Having determined that the Commission is subject to the KADEA, we review the question at issue.29 C.F.R. § 1625.5 provides, as follows:
 "A request on the part of the employer for information such as `date of birth' or `state age' on an application form is not in itself a violation of the ADEA but it will be closely scrutinized to assure that the request is for a permissible purpose and not for the purpose of discriminating against applicants on the basis of their age."
By law, appellate court judges must be at least 30 years old and must retire at age 70. Kan. Const., Art.3, § 7; K.S.A. 20-3002, 20-2608. While it is appropriate for the Commission to ascertain whether an applicant is at least 30 and not over the age of 70, the wording of the present question invites scrutiny on the basis that the inquiry is much broader than it has to be in order for the Commission to accomplish the lawful objective of finding an age-qualified candidate. It can do so by narrowing its inquiry to ask whether the applicant is between the ages of 30 and 70 thereby avoiding the appearance of discriminating against an applicant on the basis of age.
"2. May the Commission ask on the nomination formwhether the potential nominee is married, the spouse'sname, the number of children, and the children's namesand ages?"
In Attorney General Opinion No. 93-69, Attorney General Stephan concluded that the Commission as an agent for the State of Kansas is subject to the Kansas Acts Against Discrimination which prohibit discrimination against a job applicant on the basis of sex. General Stephan also concluded that the Commission is not subject to Title VII because an applicant for a vacancy on the Kansas appellate courts is not an "employee" for purposes of Title VII because of the federal exemption for appointees on a policy making level. However, federal decisions construing Title VII are persuasive authority in construing KAAD cases because the statutory schemes are analogous. Miller v.Brungardt, 916 F. Supp. 1096 (D.Kan. 1996). In Mabryv. State Board of Community Colleges, 813 F.2d 311 (10th Cir. 1987) the Court concluded that any marital or family status distinction violates Title VII only if its impact is to discriminate on the basis of sex. For example, an employer's rule that forbids employment of women who are married but not men who are married is discrimination based upon sex. 29 C.F.R. § 1604.04(a).
Our concern lies with the relevance of this information to the Commission's mission of selecting the most qualified candidates for the appellate bench. Is a married candidate better qualified to review a decision of a lower court than an unmarried candidate? Is a married man more qualified to affirm a murder conviction than a single or married woman with minor children? While the question concerning marital and family status is posed to all applicants, we believe that requesting this information increases the potential for liability under an Equal Protection challenge or an employment discrimination/disparate impact theory. A disgruntled applicant could allege that this seemingly neutral question creates "an artificial, arbitrary and unnecessary barrier to employment" because it has a significant disparate impact on a protected group.Murphy v. Derwinski, 990 F.2d 540 (10th Cir. 1993). If a plaintiff can establish that impact, the burden would shift to the Commission to rebut with evidence of a business justification for the question. Ortega v.Safeway Stores, Inc. 943 F.2d 1230,1243 (10th Cir. 1991). If faced with an Equal Protection challenge, a court would have to discern whether there is a rational basis for the Commission distinguishing between married and single applicants or between applicants with minor children and applicants with no minor children.
The Commission has not provided us with a reason why this information is necessary in securing the best qualified candidates and, therefore, we urge the Commission to reexamine whether the information sought is justified in light of the potential for liability and the perception it creates among the applicants. If there is no non-discriminatory reason for asking these questions, they should be stricken.
"3. May the Commission ask on the nomination form thereligious affiliation of a potential nominee?"
A question propounded by the Commission that inquires into one's religious affiliation implies that one's religious beliefs or lack of religious beliefs is relevant to serving on the appellate bench. Such implication is odious to the concept of separation of church and state. Both the Kansas and United States Constitutions forbid religious tests as a qualification for holding public office. Kan. Const., Bill of Rights, sec. 7; U.S. Const., Art. VI. Religion is a private matter for the individual and the state cannot force a person to profess a belief or disbelief in any religion nor may the government inquire into the religious beliefs and motivations of officeholders.Lemon v. Kurtzman, 403 U.S. 602, 29 L.Ed.2d 745,91 S.Ct. 2105 (1971); Torcaso v. Watkins, 367 U.S. 488,6 L.E. 982, 81 S.Ct. 1680 (1961); McDaniel v. Paty, [concurring opinion by Brennan and Marshall], 435 U.S. 618,55 L.E.2d 593, 98 S.Ct. 1322 (1978). In Torcaso, supra, the United States Supreme Court invalidated onFirst Amendment grounds a state constitutional provision that required a public officeholder to declare belief in the existence of God. The Court condemned the "discredited policy of probing religious beliefs by test oaths or limiting public office to persons who have a belief in some particular kind of religious concept." The Commission's inquiry gives the impression that there may be some religious affiliations that are more compatible or incompatible with serving on the appellate court — a notion that is prohibited by the First Amendment to the United States Constitution and section 7 of the Kansas Bill of Rights. Furthermore, the KAAD prohibits discrimination against a job applicant on the basis of religion. K.S.A. 44-1009. This section mirrors the Title VII prohibition. 41 U.S.C. § 2000e-2(a). K.A.R.21-30-17(e) prohibits "any [pre-employment] inquiry into organization memberships, the name or character of which could indicate the . . . religion . . . of the applicant." The Kansas Human Rights Commission proscribes indirect queries into one's religious affiliations. Based on these authorities, it is our opinion that the Commission may not directly or indirectly inquire into a judicial applicant's religious affiliation.
"4. May the Commission ask on the nomination form aseries of health-related questions. Specifically:
 "(a) Within the past five years, have you been diagnosed with or have you been treated for bipolar disorder, schizophrenia, paranoia, or any other psychotic disorder? If `yes,' explain.
 "(b) Do you currently have any condition or impairment (including, but not limited to, substance abuse, alcohol abuse, or a mental, emotional, or nervous disorder or condition) which in any way currently affects, or if untreated could affect, your ability to serve as a judge of the appellate courts in a competent and professional manner? If `yes,' explain.
 "(c) Have you been treated for alcohol or drug abuse in the past five years? If `yes,' please describe the treatment and explain how you have dealt with the condition."
Attorney General Opinion No. 93-69 concluded that the Commission is subject to Title I of the Americans with Disabilities Act (ADA) and to the KAAD, both of which prohibit discrimination against qualified individuals with disabilities in employment situations. Since the issuance of that opinion, one federal district court has reviewed similar mental health related questions propounded to judicial candidates by the Florida Judicial Nominating Commission. Doe v. The Judicial NominatingCommission for the 15th Judicial Circuit of Florida,906 F. Supp. 1534 (Fl. 1995).
In Doe, supra, the Court never addressed a Title I application; rather, the court reviewed Title II of the ADA, which prohibits a public entity from imposing eligibility criteria that screens out or tends to screen out disabled individuals from enjoying a program or activity offered by the public entity and concluded that the Florida Judicial Nominating Commission is a public entity subject to Title II. The Court then proceeded to evaluate six health-related questions, three of which addressed mental health and substance abuse.
28 C.F.R. § 35.130(b)(8) prohibits public entities from using eligibility criteria to screen out disabled individuals unless the criteria are necessary. Under the "necessity exception" public entities such as a judicial nominating commission may utilize eligibility criteria that screen out disabled individuals "if the criteria are necessary to insure the safe operation of the program or if the individual poses a direct threat to the health and safety of others." The Florida Judicial Nominating Commission argued successfully that questions relating to the mental health of a judicial applicant are justified by the necessity exception.
 "Judges in our society are vested with extraordinary power. Decisions of life and death, liberty or imprisonment, custody of children, and a host of weighty issues constitute the daily diet of those who serve on the bench. It is absolutely imperative that applicants for these positions be thoroughly vetted to assure their physical and mental fitness. The Florida Constitution places a large part of this responsibility in the hands of the nominating commission. As the gatekeepers of the appointive route to the bench, the Commission's task is to invite the best to apply, to scrutinize the applicants, and then to nominate only the most qualified for the Governor's consideration. Protecting the public is a paramount goal and, therefore, the Court agrees with the Judicial Nominating Commission's contention that the necessity exception is applicable to the judicial selection process."
The Court concluded that Title II of the ADA does not prevent inquiry into the area of diagnosis and treatment for severe mental illness. However, the Court then had to address the issue of whether the mental health related questions were over-inclusive because they required disclosure of information about past treatment or counseling that had no bearing on the applicant's present ability to perform the job.
 "All of these cases reinforce the principle that, under the ADA, the forced disclosure of information relating to disabilities without a necessary basis for the information is a form of discrimination because it screens out, or tends to screen out the disabled by imposing disproportionate burdens on them. . . . Therefore, where the inquiry has no reasonable relationship to job performance, but imposes a burden on individuals with disabilities by requiring them to make public disclosure of irrelevant present, past or perceived disabilities, the inquiry violates the ADA."
Citing case law from other jurisdictions that considered mental health related questions propounded to candidates for bar admission the Court concluded that wide-open inquiries into "any form of mental illness" or "any form of emotional disorders or disturbances" were over-inclusive and violated Title II of the ADA. Clarkv. Virginia Board of Bar Examiners, 880 F. Supp. 430
(E.D.Va. 1995). The Court also concluded that inquiry into treatment for substance abuse is justifiable provided the inquiry is restricted to narrow time parameters.
Applying the Doe analysis to the questions at issue, it is our opinion that the Commission's questions pass muster under Title II because they are reasonably related to job performance and are subject to reasonable time limitations. Questions similar to questions (a) and (b) have been upheld in other jurisdictions when challenged by bar applicants and the National Conference of Bar Examiners has approved such questions for use on bar admission forms. See Clark, supra, footnote 22, 18; Applicants v. Texas State Board of Bar Examiners, 1994 W.L. 776693 (W.D. Texas 1994) and Memorandum from the National Conference of Bar Examiners (February 24, 1995).
However, under a Title I analysis, the questions constitute impermissible pre-employment medical inquiries and the Commission may subject itself to liability under Title I as well as the KAAD.42 U.S.C. § 12112(a) prohibits a "covered entity" from discriminating against a qualified individual with a disability because of the disability in regard to job application procedures. "Covered entity" is defined as an "employer." 42 U.S.C. § 12111(2). "Employer" includes a "person" and the definition of "person" is the same as Title VII's definition which includes state government or a governmental agency. 42 U.S.C. § 12111(7);42 U.S.C. § 2000e. While the Commission does not actually employ the applicant, Attorney General Opinion No. 93-69 concluded that, under Title VII case law which interprets "employer" to include entities that play an integral part of the employment process, the Commission is an agent for the state and is subject to both the ADA and the KAAD. We have found no cases issued subsequent to Attorney General Opinion No. 93-69 that would change that conclusion.
Both the ADA and the KAAD restrict an employer's ability to make inquiry of job applicants in an effort to discover disabilities or perceived disabilities on the basis that such information has been traditionally used to exclude applicants with disabilities before their ability to perform the job was evaluated. In short, an employer may not ask disability-related questions until it makes a conditional job offer to the applicant. 42 U.S.C. § 12112(d); 29 C.F.R. § 1630.13(a); U.S. Equal Employment Opportunity Commission ADA Enforcement Guidance: Pre-employment Disability-RelatedQuestions and Medical Examinations (December, 1995) [EEOC Guidance Manual]; K.A.R. 21-34-2, 21-34-3. After making a conditional job offer, an employer may make medical inquiries and may condition a job offer on the results of such inquiry if all employees in the same job category are subjected to such an inquiry regardless of disability. 29 C.F.R. § 1630.14(b), K.A.R. 21-34-4. If the employer rejects the applicant after asking a disability related question, the focus will then shift to whether the rejection was based on the results of that question. EEOC Guidance Manual, Appendix III, pg. 529. If the question screens out an individual because of a disability, the employer must demonstrate that the reason for the rejection is job related and consistent with business necessity. 42 U.S.C. § 12112(b);29 C.F.R. § 1630.10, 1630.14(b)(3); EEOC Guidance Manual, Appendix III, pg. 529
At the pre-offer stage, which is the point at which the Commission participates, it may not ask questions that are likely to elicit information about a disability. EEOC Guidance Manual, Appendix III, pg. 530. Moreover, the Commission may not list a number of potentially disabling impairments and ask the applicant to indicate any of the impairments that he or she may have. 29 C.F.R. Appendix to Part 1630 — Interpretive Guidance on Title I. All three questions at issue inquire into possible impairments and, therefore, they are impermissible under Title I of the ADA. [The EEOC Guidance Manual specifically prohibits questions relating to treatment for drug or alcohol abuse.]
We realize that the area of disability law is evolving and that much remains to be litigated in the employment arena including whether entities such as the Commission are covered by Title I. However, at this point it is our opinion that while the questions at issue here are sufficiently narrow to withstand Title II scrutiny they are not permissible under Title I.
Summarizing our opinion, the Supreme Court Nominating Commission is subject to the Kansas Acts Against Discrimination, the Kansas Age Discrimination in Employment Act and the Americans With Disabilities Act. Question number 1 regarding the age of the judicial applicant invites scrutiny on the basis that the inquiry is broader than it has to be in order to ensure that a judicial candidate is legally qualified to apply. Question number 2 regarding the candidate's marital status and family situation is inappropriate in the absence of a legally justifiable basis for the inquiry. Question number 3 which requests the religious affiliation of the candidate violates theFirst Amendment to the United States Constitution, section 7 of the Kansas Bill of Rights and the Kansas Acts Against Discrimination. Finally, the mental health related questions, although appropriate under Title II of the Americans With Disabilities Act because they are reasonably related to job performance and are subject to reasonable time limitations, are not permissible under Title I of the ADA and the Kansas Act Against Discrimination.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Mary Feighny Assistant Attorney General
CJS:JLM:MF:jm